*Combs* for the plaintiff; *Wickliffe* and *Haggin* for the defendant.

---

ASSUMPSIT.

Case 122.

## *Taylor vs. Bank of Illinois.*

Error to the Union circuit; ALNEY MCLEAN, Judge.

*Depositions. Evidence. Bill of exchange. Protest. Notice. Corporations. Constitutional law. Authentication.*

October 15.

Judge MILLS delivered the Opinion of the Court.

On the 13th September, 1822, Nicholas Casey, a resident of the state of Illinois, drew his bill of exchange in the following words:

"EXCHANGE FOR $3860.

*Shawneetown. Ill* 13 *September,* 1822.

Bill of ex-
change sued
on.

SIR—Sixty days after date of this, my only bill of the same tenor and date, pay to Samuel Casey or order, three thousand, eight hundred and sixty dollars, value received.          (Signed,)

*Nicholas Casey.*"

To John C. Rives, esq. Shawneetown, Ill.

Endorse-
ments.

This bill was endorsed, first, by Samuel Casey, to Gibson Taylor; next, by Taylor to Beverly Miller; by Miller to Thomas Duncan; and by Thomas Dun-

ean to the president, directors, and company of the bank of Illinois.

Every party to the bill, except Gibson B. Taylor, were residents of Illinois, and he was a resident of Kentucky.

Indeed, the bill was drawn by Nicholas Casey for the purpose of raising money, and all the rest endorsed it for his accommodation alone. It was discounted by the bank at his instance, and the proceeds carried to his credit. Rives, the drawee, was at the time the bill was discounted, and ever since, the cashier of the bank, and had the custody of its money and papers.

After the bill arrived at maturity, not being paid, the bank brought this suit, for the recovery of the amount, against Gibson B. Taylor, the second endorser, and has recovered a verdict and judgment, from which Taylor has appealed.

There are various questions of law presented in the record on the trial, of which we shall notice all that are worthy to be considered.

The plaintiffs first tendered in evidence a deposition taken in the state of Illinois, under a *dedimus* issued by the clerk of the court below, and a notice given to the defendant in that court. The deposition was objected to, because the *dedimus* was issued by the clerk without any affidavit of the materiality of the witness and of his residence. To obviate this, the plaintiffs introduced and proved by the clerk, that there was an affidavit filed before the *dedimus* issued, but it was lost or mislaid, and still this objection to the deposition was insisted upon, and the clerk's evidence objected to.

We perceive no weight in the objection to the deposition, if the clerk's testimony is admitted, nor do we perceive any valid objection to the admission of the clerk. After the *dedimus* was issued, the affidavit had performed its functions, and although it was the duty of the clerk to preserve it, like other papers in his office, yet if he, through accident, or even design, had mislaid it, as he was the keeper of

## Margin notes

TAYLOR
vs.
BANK OF
ILLINOIS.

Residence of the parties.

Bill an accommodation for Casey, and discounted at the bank for his benefit.

Suit by the Bank against Taylor, the second endorser, judgment, and appeal.

Existence and loss of the affidavit, on which a *dedimus* issued to take the deposition of a nonresident, may be proved by the clerk, and thus its place supplied.

TAYLOR
vs.
BANK OF IL-
LINOIS.

it, pointed out by law, and not appointed by the party, we see no propriety in causing the party to lose the testimony which he had prepared, through the act of the officer; and it was competent for the party to shew that he had complied with the law, by the best evidence in his power.

Deposition of a nonresident taken in one suit, may be read in other suits between the same parties, where the same points are at issue.

As to the exceptions to the notice, we cannot admit their validity. The notice was served a reasonable time before the deposition was taken, and pointed out the time, even the hour, and place at which the deposition was to be taken, with precision, and described the suit as an action of trespass upon the case, which this really is. But it is insisted, that there were other suits between the same parties in the same court, and of the same character; and the notice did not designate in which the deposition was to be taken. If the deposition was taken in one of them, it could have been read in all, when the same points were in issue, and if there were several, there must have been a greater inducement to the defendant to attend to his interest, which must be supposed to be involved by the testimony, and there could be no deception upon him by not naming which suit.

It is not necessary in such case that the notice to take the deposition designate in what particular suit it was to be taken.

Not necessary, in proving the notice in writing of the protest of a bill, to give the defendant notice to produce the paper: this is an exception to the general rule.

The deposition itself was objected to, because it conduced to prove notice of the dishonor of the bill, conveyed by a letter sent by the mail, without producing the letter, or having given the defendant notice to produce it.

It may be admitted, as a general rule, that the contents of written documents in the hands of a party cannot be proved against him, without reasonable notice first to produce them; but written notices of the dishonor of bills of exchange, are an exception to this rule, and on well settled authority their contents may be given in evidence by parol, without any previous notice to produce them.

Evidence for the plaintiff given on the trial.

The next question which claims our attention, is a motion made to instruct the jury as in case of a nonsuit, which was overruled by the court below. The statement of facts on which this motion was made is as follows:

Rives, the drawee of the bill, deposed, that the bill was one for the accommodation of the drawer; and this fact was known to all the endorsers. That at the time the bill arrived at maturity, he himself was not at home, but had gone to the city of New-Orleans, on the business of the bank, where he remained till after the bill was due, so that it could not have been presented when due. That he never had any funds of the drawer in his hands, nor were there any circumstances authorising a presumption that he would ever accept or pay the bill; it was customary with the bank to purchase such bills, drawn for accommodation only, in the manner this was.

The deposition before noticed, proved that the deponent, as agent of the bank, presented the bill on the last day of grace to a notary public, "for the purpose of being protested for nonpayment, *which being accordingly done, he* (the deponent) *notified the endorsers of the same, by putting a written notice into the post-office at Shawneetown, Illinois, directed to the said Gibson B. Taylor, Union county, Kentucky,*" on the next day after the protest. It was also shewn, that there were two post offices in Union county, one at the county seat, within about six hundred yards of which Taylor resided, and another about eight miles from the court house, and about that distance nearer to Shawneetown.

On the back of the bill was written as follows:

"Protested for nonpayment, 15 Nov. 1823.
J. *Kirkpatrick*, N. P."

No other protest, or evidence thereof, was produced. This is a substantial summary of the proof.

As to the want of a protest, as it seems to have been relied on as important in the court below, we shall at once dismiss it from the controversy. This is, to all intents, an inland bill; and with regard to such, no protest is necessary by the principles of the common law. It is true that we have a statute, as they have in England, which authorizes the protest of such bills; but all the use of it is, to entitle the holder to damages. It is otherwise not essential to

*(margin notes: TAYLOR vs. BANK OF ILLINOIS.)*

*(margin notes: Bill of exchange, drawn in Illinois, by a resident of that state on another resident, is inland, and the protest of a notary not necessary,)*

the bill. We have no evidence before us that the state of Illinois has such a statute; and if we presume that state, in mercantile transactions, to be governed by the law merchant, unaltered by statute, a protest in the case of this bill was not *only* unnecessary, but, if it had been produced, it could have proved nothing in favor of the holder of the bill. On this point, the language of Justice Johnson, of the Supreme Court, in the case of the Union Bank vs. Hyde, 6 Wheat. 572, (a case in point,) well applies: "By some assumed analogy, or mistaken notions of law, this practice of protesting inland bills has now become very generally prevalent; and since the inundation of the country with bank transactions, and the general resort to this mode of exposing the breaches of punctuality, which occur upon notes, a solemnity, cogency, and legal effect, have been given to such protests in public opinion, which certainly has no foundation in the law merchant. The nullity of a protest on the legal obligation of the parties to an inland bill, is tested by the consideration, that independently of statutory provisions, (if any exist any where) or conventional understanding, the protest on an inland bill is no evidence, in a court of justice, of either of the incidents, which convert the conditional undertaking of an endorser into an absolute assumption."

The protest then aside, it was necessary for the plaintiffs in this case to prove the presentment of the bill at the proper hour, or to excuse it by circumstances, and on its being dishonored, to give notice thereof to the endorser.

There was no presentment made of this bill to the drawee, either for his acceptance or payment; but there are circumstances averred in one count of the declaration, and made out in proof, which fully excuse it. It never was presented for acceptance till it arrived at maturity; nor was it necessary that this should be done, as the bill is not payable at sight, or at so many days after sight, but on a certain day. In such a case, if the bill is presented for acceptance, and acceptance is refused before it is due, immediate notice thereof must be given. On the contrary, it

*Margin notes:*

TAYLOR vs. BANK OF ILLINOIS.

and of course is not evidence of demand and nonpayment.

Bill payable so many days after date, need not be presented till due; but if presented for acceptance before, and dishonored, there must be immediate notice.

may be omitted till the time of payment, when both the acceptance and payment may be made a question together. This bill was managed in this way, and on the day of acceptance and payment, it is abundantly shewn, that neither funds nor drawee were within the state.

TAYLOR
vs.
BANK OF ILLINOIS.

It is said to be the duty of the holder of a bill to make diligent search for the drawee at his residence, or to go to him if in the realm, where there is no place of payment, to procure his acceptance or discharge of the bill. But this rule is laid down to fit the case of ignorance of the holder, as to where the drawee or his funds really are; and it cannot be incumbent on the holder to search for one, whom he knows, and can prove, to be beyond any reasonable degree of searching. If on the trial, therefore, the holder can shew that the drawee was so far distant that a search for him would have been nugatory, and that there never were any provisions made by the drawee for the discharge of the bill, as is done here, it will excuse the presentment of the bill, and sufficiently establish the dishonor thereof. A question may be made as to whether the drawee was sufficiently distant. It is said in the books, that if the drawee be in England, he must be sought for; but if he be out of the realm, it will excuse the non-presentment of the bill. The same rule, we apprehend, ought to apply in the United States, as to absence from the state in which the transaction is to be done. Although the whole of the states compose one nation, and are embraced in one government, yet we apprehend it would be a most rigorous rule, which should require a trip across this extensive continent to present a bill. We therefore conceive that absence from the state is a sufficient excuse.

Where there is no place fixed for the payment of a bill, the holder must make diligent search for the drawee, at his residence, or within the realm of England; but here, drawee's absence from the state excuses this duty.

It is however urged, that the plaintiffs here had sent away the drawee on their own business, and therefore ought not to be, allowed to excuse the want of presentment by such an absence. We cannot admit that this makes any difference, unless it could be shewn that it was done with a design to dishonor the bill, which is far from being true. The drawer had drawn upon him without consulting

If the bill be drawn on the cashier of a bank without funds, or his authority, the bank holding the bill is not prejudiced by

TAYLOR
vs.
BANK OF IL-
LINOIS.

sending the
cashier a-
broad, so that
the demand
could not be
made of him
in person.

him, or having any authority or encouragement to
do so. As he was in the employ of the plaintiffs,
they sent him on necessary business, when retaining
him at home without the necessary funds in his
hands belonging to the drawer to discharge the bill
would have been useless, and could not have benefit-
ed the drawee; and sending him away could not af-
fect the drawer's interest. Of course, no party to the
bill can complain of this.

Want of
funds in the
hands of
drawee of an
accomoda
tion.inland
bill, is no ex-
cuse for not
giving notice
to an *endorser*
entitled to
recover on
the drawer.

Having seen that the presentment is supplied,
and the dishonor of the bill established, we shall
turn our attention to another indispensable requi-
site; and that is, notice to the defendant of the
dishonor of the bill. We say indispensable, because
it is well settled by high authority, that an accom-
modation endorser is entitled to strict notice. The
court below seems to have gone upon the idea, that
as this was not a real mercantile transaction, and that
all the parties knew that there were no funds, notice
was not necessary. The rule is otherwise: French's
ex'x. vs. the Bank of Columbia, 4 Cranch, 141. It
has been held, that the want of funds in the hands of
the drawee, or any reasonable expectation that the
bill would be honored, excuses the want of notice to
the drawer; but not so as to the endorser; and we
apprehend the exception can never apply to an en-
dorser, unless it was shewn that the endorser was
substantially the drawer; that the bill was drawn
and endorsed for his benefit; that he received the
proceeds, and had no other party to the bill, to
which he could resort in case he paid the contents of
the bill, which is far from being the case in this
transaction.

Notice that a
a notary pub-
lic had *pro-
tested* an *in-
land* bill of
exchange,not
equivalent to
notice of the
dishonor of
the bill, and
is insufficient.

As notice is necessary, it remains to inquire, whe-
ther such a notice is proved as will satisfy the de-
mands of the law. Here, the plaintiff below must
fail. Their notice was sent off in sufficient time,
but it does not appear that the notice really apprized
the defendant of the dishonor of the bill, but barely
that a notary public had protested it, when a notary,
as we have seen, had nothing to do with it. The
language of the deposition, which we have already
recited, conveys no other idea. It does not say that

the letter contained any other information than that a notary public had protested the bill, a fact entirely immaterial.

There is also another defect in this notice, which has been insisted on in argument, and which merits our attention. If it be granted that this letter contained information of a dishonor of the bill, it was not directed to any one of the post offices in the county where there were two. As sending a letter by the mail, is admitted in lieu of personal notice, the holder of the bill ought to direct it to that post office where there was the greatest probability that the person notified would receive it. Hence this letter ought to have been directed to the nearest post office; or if to one more distant, it must be shown that the defendant usually resorts to the most distant office, and there receives his letters. Otherwise the nearest will be taken as the one to which the communication must be sent. If any thing excuses this it must be ignorance in the holder of the defendant's residence, which here does not seem to be the fact. Here, however, the letter, as stated by the witness, was directed to the county only, and was left to make its way through the mail to some post office in the county of Union, without determining which. This was too general, where the residence of the party was known.

It may be said, that under such direction, the post officers would send to the court house, as of course. There may be some probability that they might do so; but it cannot be legally presumed. It is better to leave the party, who has given such a vague direction, to prove that such was the practice of the office, into which the letter was placed, or rather of the last distributing office, if one intervened, where the letter had the last direction given to it, guiding it to its point of destination, such proof as that might, render such a general direction more specific, but until it is made, we cannot hold this notice good, even if it contained the necessary facts to be communicated. For these defects in the notice, the court below ought to have instructed the jury as in case of a non suit.

TAYLOR
vs.
BANK OF ILLINOIS.

Notice of the dishonor of a bill put into the Post office at Shawneetown, directed to defendant, *Union county, Ky.* where there were two post offices in the county, one at the courthouse, near which defendant resided, and the other eight miles distant, is insufficient,

Query, if it were proved that by the practice in the proper post office, such a direction would have carried the letter to the county seat.

TAYLOR
vs.
BANK OF IL-
LINOIS.

This conclusion renders it unnecessary to notice some other acts of the court and of the counsel, which seem to have been predicated on the idea that notice was unnecessary.

It is not necessary, in an action by the corporation of another state, on the trial of the plea of non-assumpsit, to produce its charter, or otherwise prove its existence.

One other question, which may again, occur on another trial, is worthy of consideration. The plaintiff offered in evidence, the charter of the bank; and it was objected to; and it was insisted that it was necessary that the plaintiff, under the issue in the cause, should shew that there was such a corporation. The issue was non assumpsit, and we do not conceive that this brought the existence of the plaintiff in issue. That the plaintiff, who holds the affirmative of that issue, should be compelled to prove that there was such a being as himself, is a rule with which we are unacquainted. But the charter may become necessary to shew the capacities of the bank, and to fix the degree on which the bill must stand, whether as foreign or inland; and the charter, when produced here has shown nothing, which authorizes the bill to be treated in any other manner than an inland bill; and as it may be again necessary for this purpose to use it, we shall say something on the objection to its admission.

Copy of the statute of Illinois offered to be read in evidence from the printed session acts of the state.

The act was not certified by any officer of the state of Illinois, and there was no seal of the state to verify it; but a pamphlet was produced which stated in its title page that it was printed by the printer to the commonwealth, or then territory, and under that authority, and from that pamphlet the act was allowed to be read.

The constitution of the United States declares that—

Constitution of the U. S. in relation to the public acts and records of the several states.

"Full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state. "And the the congress may, by general laws, prescribe the manner in which such acts, records, and judicial proceedings *shall* be proved, and the effect thereof."

By an act of the 26th of March, 1790, Congress has provided that the acts of the legislatures of

the several states, shall be authenticated by having their respective seals affixed thereto.

The question then may arise—can an act of a sister state be admitted under the municipal provisions of states which do not conform to the act of congress; or must the mode of authentication pointed out by congress be the exclusive mode? As this is a question arising under the constitution and laws of the United States, it would have been satisfactory to us to have met with the decision of the supreme court thereon, but we have found none such.

A circuit court of the United States has touched the subject, and has held that without the authentication required by the act of congress the statute of a sister state could not be used. 1 Peters' Rep. 352; and this decision has been followed in North Carolina. State vs. Twitty, 2 Hawkes, 441; 1 Starkie on Ev. 163, in note.

But it was previously held in that state, that the statutes of Virginia, printed under the authority of the commonwealth, were good evidence. Poindexter vs. Barker, 2 Haywood, 173. The supreme court of Pennsylvania, in the case of Thompson vs. Massie, 1 Dall. 402, admitted the statutes of another state, edited by the public printer, under the authority of the state. The same point was ruled in the same way in, Bidolis vs. James, 6 Bin. 391. In the state of Vermont a similar decision has taken place.

Between these conflicting decisions we prefer the latter as most consonant to reason, and conformable to principle. In support of this choice, an act of our own legislature in its spirit is with us.

The third section of an act passed 11th February, 1809, 2 Dig. L. K. 1115: provides, "copies of any of the printed laws of any state or Territory of the United States, which may have been heretofore, or may hereafter, be received in the Secretary's office, and which shall have been printed under the authority of any such state, or territory, when duly certified under the hand and seal of the Secretary of State, shall be admitted and recorded as evidence of such law, *in like manner with such printed copy*, in any

VOL. VII.    3 Y

---

**TAYLOR vs. BANK OF ILLINOIS.**

Question stated.

Cases ruling that no authentication of the statute of a sister state but that prescribed by the act of congress, is competent.

Cases contra, held to be the law.

Statute of a sister state found in a book purporting to be printed by its authority, is competent.

Statute of Kentucky making the copies of the laws of a sister state &c. certified by the secretary of state from the books in

TAYLOR
VS.
BANK OF IL-
LINOIS.

_____

his office evi-
dence in our
courts.

of the courts, or before any judicial officer, of this commonwealth."

This shews that the legislature understood the rule to be, that the laws printed under the authority of a sister state, were evidence in our courts; and if they are not admitted as such, then the legislature has done nothing by the provision cited. For if the printed copy itself, from which the Secretary of state shall certify copies, cannot be read in evidence, then the copy certified by him cannot, and it is vain for him to certify any. But if the copies printed under the authority of a state can be admitted, then a copy certified by the secretary of state can be read also.

Powers of the
federal gov-
ernment ,ex-
clusive and
concurrent
with the
states.

We are aware that there are powers vested in, and to be exercised by congress, which exclusively belong to that body, and are prohibited to the states. There are also concurrent powers between congress and the state legislatures, which, when exercised by congress, may become exclusive; but this power of a state admitting evidence of laws of a sister state, when not certified as the act of congress requires, belongs to neither class of these powers. It is not a prohibited power to the states by express provision. It is not concurrent, properly speaking, because no state can prescribe a rule of evidence in this particular for the Union, but only for itself in subordination to what congress may prescribe.

States of the
union may
admit as evi-
dence in their
courts of jus-
tice the pub-
lic acts of
each other,
without the
authentica-
tion required
by the act of
congress;
with such au-
thentication
they *must* be
admitted.

The provision was inserted in the constitution of the United States to secure to each state credit in its official acts as such, in the sister states; and to prevent any state from treating the others as aliens, by excluding their laws and adjudications, and again retrying controversies settled abroad. If then any state shall submit to the act of congress on the subject, and shall admit, and give due faith and credit to the public acts, records, and judicial proceedings, when certified as the act of congress requires, and shall also admit these same documents when certified in other modes, it is but rendering greater facilities in effectuating the purpose which the provision of the constitution intended. While, therefore, no state ought to, or can legally exclude any of these

documents, when certified according to the act of congress, it may without any repugnance to the laws of the union, admit the same documents verified in other modes. Hence we conceive that if certified according to the act of congress they *must* be admitted, and if certified or authenticated according to state provisions they *may* be admitted without contravening the laws of the union. This construction leaves the state government in possession of all necessary powers for carrying on with convenience and ease its intercourse with the sister states, while it acts in perfect harmony with the paramount laws of the nation. We, therefore, on principle, conceive that the party in this cause was not bound up to produce the act of Illinois certified as the act of congress requires, and that it was presented in this case in a way which entitled it to be read, because so much credit ought to be attached to that government and its public printer, as to admit his copy of the law as genuine.

*Judgment reversed, verdict set aside, and cause remanded for new proceedings, not inconsistent with this opinion.*

*Haggin* for plaintiff; *Crittenden* for defendants.